UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | |
| : | Case No.: 21-CR-508 (BAH) |
| LUKE WESSLEY BENDER and : | |
| LANDON BRYCE MITCHELL : | |
| : | |
| Defendants. : | |

**GOVERNMENT'S RESPONSE TO DEFENDANTS' SENTENCING MEMORANDA**

The United States of America respectfully submits this response to defendants' memoranda in aid of sentencing, ECF Nos. 116 and 117. Because a high-end Guidelines sentence remains a reasonable and appropriate reflection of each defendant's unlawful conduct, criminal history, and personal characteristics, the government reiterates its requests that the Court sentence Luke Wessley Bender to 30 months of incarceration and Landon Bryce Mitchell to 33 months of incarceration, and order each to complete three years of supervised release and pay $2,000 in restitution and a $180 special assessment, *see* ECF Nos. 114 and 115.

### I. Introduction

Both defendants object to the Guidelines Imprisonment Ranges calculated by the Probation Office, and then seek downward variances from their own proposed applications of the Guidelines. This Court should turn those requests aside. First, Bender and Mitchell have not established that Probation's Guidelines calculations – which result from the consensus application of Specific Offense Characteristics in January 6 cases – are incorrect. Second, neither defendant has provided convincing reason for the Court to jettison the Sentencing Guidelines and sharply reduce the penalties applied to their felonious obstruction of the certification of the 2020 Electoral College vote.

1

Luke Bender requests a non-custodial sentence, which would be a significant downward variance from the Guidelines range correctly calculated by Probation and even from the Guidelines Range if the Court sustains his objections to the Presentence Report. Bender suggests that the Court should consider in imposing such a significantly below-Guidelines sentence all of the conduct that he *did not* commit on January 6, 2021, *see* ECF No. 116 at 14, 24, 38; absolve him of personal responsibility for his obstructive deletion of cell phone images and replacement of his mobile phone, *id.* at 14-15, 21, 25; review his criminal history in light of his "struggles with decision-making and alcohol abuse," *id.* at 26 and assurances that his prior conduct "does not reflect the person he currently is, or the progress that he has made in maturing and developing from the person he once was," *id.* at 36; and render a sentence commensurate with those who *did not* enter the Senate Floor with the intent to obstruct the certification, *id.* at 33. He faults the government for imposing what he believes to be "an arbitrary line of demarcation between misdemeanor parading and felony obstruction based on where he went inside the Capitol." *Id.*

Similarly, Landon Mitchell requests a variance from Probation's estimated Guidelines Range, which would be variance even if the Court declines to find that he substantially interfered with the administration of justice on January 6. Mitchell contends that a lenient sentence is appropriate in light of his significant challenges with drug dependency and his traumatic childhood and adolescence, which, in turn, resulted in repeated arrests and convictions. *See* ECF No. 117 at 5-11. Regarding the offenses of his conviction, Mitchell asserts that he "fell for Mr. Trump's lies" about the 2020 election, *id.* at 11; "allowed himself to be swept up into the discourse that was spreading on Facebook and other online forums prior to January 6," *id.* at 14; and "followed the crowd" into the Capitol Building and, eventually, onto the Senate Floor and Dais, *id.* at 14-15. Mitchell, too, argues in mitigation that he did not commit other offenses while he was inside the

Capitol on January 6. *Id.* at 15-16. But scores of people who equally believed lies about the election and who have led equally difficult lives did not attempt to overturn the 2020 election of the United States President, so none of those excuses warrant the drastic leniency Bender and Mitchell seek.

## II. Application of Specific Offense Characteristics

Bender and Mitchell each object to Probation's proposed application of the Specific Offense Characteristic ("SOC") set forth in U.S.S.G. § 2J1.2(b)(2), for their conduct that substantially interfered with the administration of justice by obstructing Congress's certification of the 2020 presidential election results. ECF No. 116 at 21-22 (citing *United States v. Seefried*, No. 21-cr-287, 2022 WL 16528415, at *2 (D.D.C. Oct. 29, 2022)); ECF No. 117 at 4. Neither defendant addresses or distinguishes *United States v. Rubenacker*, No. 21-cr-193 (BAH), Sentencing Tr. at 55-81, in which this Court thoroughly discussed § 2J1.2 and its application to individuals who obstructed the certification on January 6, 2021. The government submits that the Court's prior determination – that the phrase "administration of justice" is not limited to the activities of courts or grand juries, or even federal adjudicatory proceedings, *id.* at 62 – was correct and should be adopted in this case.

Indeed, except for *United States v. Rodean*, No. 21-cr-57 (McFadden, J.), the Court applied § 2J1.2(b)(2) in each of the § 1512 cases that Defendants cite to discuss sentencing disparities. *See United States v. Wood*, No. 21-cr-223 (APM), Sentencing Tr. at 35-39 ("I think the plain meaning in the context of the statute and giving the proper construction that I'm supposed to give it does result in my conclusion that the administration of justice in this case includes the certification."); *United States v. Hodgkins*, No. 21-cr-188 (RDM), Sentencing Tr. at 6 ("The parties also agreed that the offense to which Mr. Hodgkins pled guilty resulted in substantial interference with the

3

administration of justice resulting in a three-level increase in the offense level under the Guidelines."); *United States v. Priola*, No. 22-cr-242 (TSC), Gov't Sentencing Memo., ECF No. 56 at 19 (reflecting that the parties stipulated to the application of U.S.S.G. § 2J1.2(b)(2)); *United States v. Allan*, No. 21-cr-64 (CKK), Plea Agreement, ECF No. 39 at ¶ 4(a) (reflecting agreed application of U.S.S.G. § 2J1.2(b)(2)).

The government also urges the Court to overrule Bender's objection to the application of U.S.S.G. § 3C1.1, which was proposed by Probation due to Bender's deletion of cell phone images and replacement of his mobile phone "so it's not traceable." Ex. 3.1 at 15:55 – 16:07. No matter whether his obstructive conduct was encouraged by others, Bender himself knowingly and purposefully took action to conceal his crimes by eliminating evidence of his whereabouts and behavior. The SOC is appropriate regardless of Bender's purported belief that (1) the pictures and videos that he took while on restricted Capitol Grounds, inside the Capitol Building, and on the Senate Floor were not material to the investigation because he "never even looked at the photographs prior to their deletion"; (2) his crimes were otherwise captured on Capitol surveillance cameras; and (3) he "had no idea that he was under investigation." First, by the evening of January 6, 2021, it was clear that the FBI would be (and was) investigating crimes that took place at the Capitol Building and would seek to identify individuals like Bender who breached the Senate Floor. And there is hardly evidence more material to Bender's guilt than the photographs that he took while obstructing the Electoral College certification.

Second, even if Bender's destruction of evidence occurred before the investigation into his crimes had commenced, the Commentary to § 3C1.1 states that the SOC applies where the obstructive conduct was purposely calculated and likely to thwart the investigation or prosecution of the offense of conviction. Unlike a prior version of Section 3C1.1, which applied only if the

defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice *during* the investigation, prosecution, or sentencing of the instant offense," Amendment 693 to the Guidelines, adopted in 2006, changed the language of § 3C1.1 to omit a temporal requirement and added new application note 1 on pre-investigation conduct. *See* U.S.S.G. § 3C1.1, cmt n.1 ("Obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction."); *United States v. England*, No. 21-5273, 2023 WL 1777533, at *16 (6th Cir. Feb. 6, 2023) ("Although no investigation into England's receipt or possession of child pornography had begun when he ran CCleaner, Application Note 1 to the guideline makes clear that the obstruction-of-justice enhancement may be based on conduct that preceded an investigation so long as that conduct 'was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction.'") Third, because obstructive conduct intended to impede an anticipated – but not yet commenced – investigation can trigger the enhancement, the fact that Bender was supposedly unaware that he was already under investigation when he deleted the inculpatory evidence does not preclude application of the enhancement. *See United States v. Jenkins*, 275 F.3d 283, 287 (3d Cir. 2001) (rejecting defendant's contention that Section 3C1.1 "requires an awareness on his part that a federal investigation had begun").

The judges of this District have repeatedly applied the Section 3C1.1 adjustment for conduct similar to that of Bender. *See, e.g., United States v. Allan*, No. 21-cr-64 (CKK), Gov't Sentencing Memo, ECF No. 44 at 2 (defendant on January 6 deleted his Facebook account and destroyed documents he had stolen, and on January 7 got rid of his cell phone because it contained evidence of his participation in the attack). For example, in *United States v. Wood*, No. 21-cr-223

(APM), Judge Mehta found applicable the obstruction SOC in part due to the defendant's deletion of text messages, photographs, and his Facebook account in the days following January 6. *Id.*, Sentencing Tr. at 21-23. In that case, which Bender requests the Court consider to avoid unwarranted sentencing disparities, ECF No. 116 at 32, the Court rejected Woods's argument, in which he asserted that § 3C1.1 should not apply because he "was deleting [text messages] based on his shame, not based on any investigation. There wasn't even a hint of an investigation at that time." *Wood*, No. 21-cr-223 (APM), Sentencing Tr. at 7. Here, Bender deleted photographs and replaced his mobile phone with the improper purpose of avoiding the detection and prosecution of his crimes. Application of § 3C1.1 is appropriate.

### III.     A Guidelines Sentence is Reasonable and Appropriate

The Government submits that the § 3553(a) factors, particularly the nature and circumstances of defendants' offenses, their history and characteristics, and the need for general deterrence, counsel that a within-Guidelines sentence is appropriate. The cases relied upon by defendants to urge the Court to vary from the Guidelines do not represent January 6 defendants "with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

*Nature and Circumstances of the Offenses*

Luke Bender and Landon Mitchell anticipated violence on January 6. Mitchell planned to "become the law" during a "civil war." Bender explained that he was not "afraid to get dirty" on January 6, 2021 and used an avatar image associated with the Three Percenter ideology.[1] He and

---

[1] Bender argues that the government's reference to his social media avatar is an improper attempt to "back door in at sentencing a fact not true to give a misleading impression of a defendant facing sentencing." ECF No. 116 at 37 (citing *United States v. Horvath*, No. 22-cr-192 (BAH), ECF No. 33). But Bender's use of Three Percenter imagery is relevant to his intent in breaching the Capitol on January 6, 2021. And, as this Court explained during the sentencing of Jennifer Horvath, there
(continued...)

Bender both advised their social media followers that they intended to "fight," and Bender posted images of their travel onto restricted Capitol Grounds to the sounds of a song titled, "Go to War." Both boasted that they had "stormed the Capitol." Defendants were among the few individuals who entered the Senate Chamber, reviewed papers on Senators' desks, and ascended to the top level of the Senate Dais. The Capitol Police Officers who cleared them from the Floor were diverted from defending other areas of the Capitol Building and expelling other rioters (some of whom were assaulting officers in the Rotunda, re-entering through the Senate Wing Door and Rotunda Door, or engaged in battle at a tunnel entrance to the Lower West Terrace). But following the events of January 6, Bender and Mitchell expressed pride on social media for their own conduct and others "who made their voices heard at the Capitol." Even months later, Mitchell told the FBI that the rioters had not gone "too far," since "it is our constitutional right, when we are being run by tyrants, to try to do something about it."

Like their compatriot rioters who joined them in breaching the Senate Floor on January 6, 2021, Bender and Mitchell did not do so idly. They did so in order to "stop the steal." As they admitted during their stipulated trials, Bender and Mitchell intended to obstruct or impede an official proceeding and did so with corrupt intent. The rioters' actions – entering the Senate and searching for evidence of wrongdoing in the certification of the Electoral College vote – were intended to find proof of "the steal" to prevent the ratification of the 2020 election results. *See* Luke Mogelson, *Among the Insurrectionists*, The New Yorker, Jan. 25, 2021, https://www.newyorker.com/magazine/2021/01/25/among-the-insurrectionists (last visited Feb. 20, 2023) ("Frantically flipping through a three-ring binder on [Senator Ted] Cruz's desk, he

---

is nothing inappropriate about the government providing relevant and truthful information for the Court's consideration at sentencing. That is true even where the defendant has refused to stipulate to the information.

muttered, 'There's gotta be something in here we can fucking use against these scumbags.'"). The unmistakable message from Bender's and Mitchell's ascent to the top level of the Dais to pose for pictures was that they, and not Vice President Pence, presided over the Senate on January 6.

For these reasons, Bender is incorrect to deem as "arbitrary" the line between those who engaged in misdemeanor parading, demonstrating, or picketing within the Capitol Building, and those, like these defendants, who entered the Senate Floor with the corrupt purpose of obstructing or impeding the official proceeding. Indeed, it would create an unwarranted sentencing disparity if the Court were to sentence Bender and Mitchell in conformity with misdemeanor defendants Juliano Gross, Dawn Munn, and Thomas Munn, as Bender requests. *See* ECF No. 116 at 33. Each pleaded guilty to misdemeanor offenses, did not enter the Capitol Building with the intent to obstruct the certification, and did not enter the Senate Floor or ascend its Dais.[2] Similarly, although he was convicted of obstruction under § 1512, Matthew Wood entered the Speaker's conference room, but not the Senate Floor. *See United States v. Wood*, No. 21-cr-223 (APM), Sentencing Tr. at 64. Thus, none of those defendants were convicted of "similar conduct" as Bender and Mitchell. 18 U.S.C. § 3553(a)(6).

*History and Characteristics of Defendants*

The sentencing factor that most distinguishes Luke Bender and Landon Mitchell from January 6 defendants sentenced to lesser terms of imprisonment is their criminal histories.

---

[2] Juliano Gross, Dawn Munn, and Thomas Munn also had no criminal histories and each argued that their characteristics justified a probationary sentence. Gross had been hospitalized on three separate occasions for mental health treatment, entered the Capitol Building in part to stream the events on social media, left of his own accord, and repeatedly met with the FBI to assist in the investigation of himself and others. *See United States v. Gross*, No. 22-cr-56 (APM), Def. Sentencing Memo at 1-2. Dawn and Thomas Munn were 55 and 57 years old, respectively, and had eight children; Dawn Munn is a nurse and Thomas Munn is a homemaker and armed forces veteran. *See United States v. Munn*, No. 21-cr-474 (BAH), ECF Nos. 99, 102, 103, 106.

8

Mitchell, who is 32 years old, already has attained a Criminal History Category of IV due to his countable convictions for street gang participation, burglary, and grand larceny. He was under court supervision on January 6, 2021, and has repeatedly violated the terms the Court imposed (and then amended) in this case.

Bender, who is just 23, has fewer countable convictions, resulting in a Criminal History Category of II.[3] But between March of 2019 and May of 2021, Bender committed, or is accused of committing, crimes on four separate occasions, resulting in 16 separate state charges. Each of the 16 charges resulted in no jail time, a suspended sentence, or has yet to be sentenced. That the government inadvertently referred to one of these charges as resulting in a conviction, rather than deferred adjudication, does not alter its belief that the Virginia courts' leniency has not deterred Bender from future wrongdoing. And Bender's compliance with the Court's conditions of release, successful outpatient treatment, and incident-free completion of one of his two terms of probation in Virginia, while commendable, do not justify a variance. They certainly do not support the significant variance Bender requests.

The cases cited by Bender and Mitchell when addressing 18 U.S.C. § 3553(a)(6) may be distinguished by the Criminal History Categories of each defendant. Section 3553 directs courts in imposing a sentence to consider "the need to avoid unwarranted sentence disparities among defendants *with similar records* who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6) (emphasis added). But neither Matthew Wood nor Nicholas Rodean, whose cases were cited by Bender, had any criminal history. *See United States v. Wood*, No. 21-cr-223 (APM), Sentencing Tr. at 63; *United States v. Rodean*, No. 21-cr-57 (TNM), Sentencing Tr. at 7. Similarly,

---

[3] The government initially over-estimated that Bender's Criminal History Category was III, which would have resulted in a Guidelines range of 27 to 33 months. *See* ECF No. 83 at 1 n.2.

9

Paul Hodgkins, *see United States v. Hodgkins*, No. 21-cr-188 (RDM), Sentencing Tr. at 10; Christine Priola, *see United States v. Priola*, No. 22-cr-242 (TSC), Gov't Sentencing Memo, ECF No. 56 at 19, and Tommy Allan, *see United States v. Allan*, No. 21-cr-64 (CKK), Gov't Sentencing Memo, ECF No. 44 at 27, cited by Mitchell, all had Criminal History Categories of I.

In each of the Senate Floor cases cited by Defendants, the Government recommended a within-Guidelines sentence, as it does in these cases. A sentence within the applicable Guidelines Range ordinarily will not result in an unwarranted disparity. *See, e.g., United States v. Smocks*, No. 21-cr-198 (TSC), Sentencing Tr. at 49; *Gall v. United States*, 552 U.S. 38, 54 (2007). Indeed, Mitchell cites two January 6 cases in which the Court imposed a within-Guidelines sentence. In *United States v. Priola*, No. 22-cr-242 (TSC), ECF Nos. 56 & 62, Judge Chutkan sentenced the defendant to 15 months' incarceration, at the low end of the applicable Sentencing Guidelines range. Similarly, in *United States v. Allan*, No. 21-cr-64 (CKK), ECF Nos. 39 & 53, Judge Kollar-Kotelly sentenced the defendant to 21 months of imprisonment, at the low-end of the applicable range.

And the two defendants for which variance was granted had characteristics apart from their lack of criminal histories that further distinguish them from Bender and Mitchell. Judge McFadden explained that Nicholas Rodean exhibited significant difficulties related to his Autism Spectrum Disorder that mitigated his culpability for obstructing Congress and that would have made incarceration "uniquely different" from other defendants. *See United States v. Rodean*, No. 21-cr-57 (TNM), Sentencing Tr. at 47-52 (sentencing defendant to 240 days of home detention despite calculating a Guidelines Range of 21 to 27 months). Indeed, Judge McFadden addressed the government's concern about creating unwarranted sentencing disparities with a non-custodial sentence, stating that, "Ultimately, I think this case stands apart." *Id.* at 50.

10

In *United States v. Hodgkins*, No. 21-cr-188 (RDM), Sentencing Tr. at 77, Judge Moss granted a variance from the 15 to 21 month Guidelines range he had calculated, but observed that, "my job today is only to fashion a fair and just sentence for Mr. Hodgkins. Each case is different, and each case requires the judge to weigh a variety of factors." *See id.* at 77-78 (sentencing defendant to 8 months incarceration, a variance from the 15 to 21 month Guideline range, because defendant "has no criminal record of any type," pleaded guilty "exceptionally early in the process," and "has taken significant steps towards his rehabilitation.").

*The Need for General Deterrence*

Finally, the government submits that a downward variance for Bender or Mitchell would undermine the goal of general deterrence that is of paramount concern in imposing sentences for those who assaulted the Capitol on January 6, 2021. As this Court has explained, "the importance of deterring future malcontents disappointed with the outcome of an election from planning for and then disrupting the peaceful transition of power after an election … weighs very heavily[.]" *United States v. Mattice*, 21-cr-657 (BAH), Sentencing Tr. at 70. "Every defendant sentenced for their conduct on January 6th is in some ways – because of the general deterrence factor that all sentencing judges have to consider – … the scapegoats, the models for the punishment that can be meted out for anybody who engages in that kind of conduct." *Id.* at 69. It is crucial to convey to future rioters and would-be mob participants—especially those like Bender and Mitchell who intend to improperly influence the democratic process—that their actions will have consequences.

Here, Bender and Mitchell made themselves the embodiment of the January 6 riots by overrunning the Senate Floor, searching through papers on Senators' desks, and ascending to the top level of the Dais in place of the Vice President of the United States. They posed for pictures at the time and in the place that a solemn proceeding associated with the peaceful transfer of

11

democratic power should have occurred. With admitted corrupt intent, Defendants obstructed the certification of the Electoral Vote. Images of their conduct, particularly while on the Dais, remain indelibly etched in the history of the violent attack on our Capitol. For those reasons, imposing a probationary sentence for Bender and a sentence one-third below Mitchell's applicable Guidelines range would significantly undermine the goal of general deterrence.

## VII. CONCLUSION

As explained above and in its sentencing memoranda, ECF Nos. 114 and 115, the government recommends that the Court impose a sentence of 30 months of incarceration as to Luke Bender, 33 months of incarceration as to Landon Mitchell, and three years of supervised release, $2,000 in restitution, and a $180 special assessment for each Defendant.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: */s/ Jordan A. Konig*
JORDAN A. KONIG
Supervisory Trial Attorney, Tax Division,
U.S. Department of Justice
Detailed to the U.S. Attorney's Office
P.O. Box 55, Washington, D.C. 20044
Jordan.A.Konig@usdoj.gov
Tel.: 202-305-7917

*/s/ Samantha R. Miller*
SAMANTHA R. MILLER
Assistant United States Attorney
New York Bar No. 5342175
United States Attorney's Office
For the District of Columbia
601 D Street, NW 20001
Samantha.Miller@usdoj.gov